IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| VALLEY NATIONAL BANK, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CASE NO. 2:20-CV-961-RAH-KFP |
| | ) |
| PIOTR CZAPLA, SUSAN M. CZAPLA, | ) |
| and QUALITY HOME HEALTH CARE, | ) |
| INC., | ) |
| | ) |
| Defendants. | ) |

## **RECOMMENDATION OF THE MAGISTRATE JUDGE**

Before the Court are Valley National Bank's Motion for Default Judgment (Doc. 61) as to Defendant Quality Home Health Care, Inc. (Quality Home), its Motion for Summary Judgment (Doc. 67) as to Defendants Piotr and Susan Czapla, and the Czaplas' two Motions to Dismiss (Docs. 69, 70).[1] Upon consideration of the motions and the parties' briefing and evidentiary submissions, the undersigned RECOMMENDS that the Court GRANT Valley National's motions and DENY the Czaplas' motions, as set forth below.

## I.    INTRODUCTION

This case arises out of two commercial loans made to Quality Home by Valley National,[2] both of which were personally guaranteed by the Czaplas. When Quality Home

---

[1] The Czaplas filed their first Motion to Dismiss (Doc. 22) in June 2021. It was denied as asserting defenses outside the four corners of the Complaint (Doc. 27). The now-pending motions were filed after Valley National filed its summary judgment motion.

[2] Valley National is the successor by merger to USAmeriBank, effective January 1, 2018. Doc. 74 at 5. USAmeriBank is the successor by merger to Aliant Bank, effective December 30, 2011. *Id.* The loan documents at issue in this lawsuit bear the names USAmeriBank or Aliant Bank. *See* Doc. 67-1. For purposes of clarity, the Court will refer to the bank as "Valley National" throughout this opinion.

and the Czaplas defaulted under the terms of the loan documents by failing to make payments, Valley National accelerated the loans and began collection proceedings. Because a statement of undisputed facts is required for summary judgment and will also provide a factual background for the remaining motions, the Court begins with the undisputed facts.

## II.    UNDISPUTED FACTS

Valley National made a commercial loan to Quality Home for $411,500.93 on December 15, 2015. *See* Doc. 67-1. In connection with this loan, Susan Czapla, as president and secretary of Quality Home, signed a promissory note, business loan agreement, and commercial security agreement dated December 15, 2015. Doc. 67-1 at 10–12, 14–20, 43–51. The loan was also secured by a real estate mortgage and assignment of leases and rents dated May 28, 2008, and signed by Susan Czapla as president of Quality Home and Piotr Czapla as secretary. Doc. 67-1 at 22–31, 33–41. The promissory note contains the following provision regarding Quality Home's obligation to pay attorney's fees incurred to collect the note:

> Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

Doc. 67-1 at 11. The business loan agreement, mortgage, assignment of leases and rents, and commercial security agreement contain similar provisions for payment of attorney's

fees and expenses incurred to collect on the loan. Doc. 67-1 at 18, 26, 37, and 46. On January 8, 2016, the Czaplas signed individual commercial guaranties for this loan. Doc. 67-1 at 51–59. Those guaranties also contain a provision regarding payment of attorney's fees:

> Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorney's fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and the Guarantor shall pay the cost and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

Doc. 67-1 at 54, 58.

Quality Home took out another commercial loan on August 27, 2017, in the amount of $71,977.10. Doc. 67-1 at 61. As with the previous loan, Susan Czapla signed a promissory note and business loan agreement in her capacity as Quality Home's president. Doc. 67-1 at 60–63, 65–71. This loan was secured by a mortgage and assignment of rents executed by Susan Czapla as president on Quality Home on March 9, 2015 (Doc. 67-1 at 73–80, 83–88), and a commercial security agreement dated February 27, 2015, which Susan Czapla also signed in her capacity as president (Doc. 67-1 at 90–97). On March 17, 2017, the Czaplas signed individual guaranties for this loan. Doc. 67-1 at 99–106. The loan documents for the second loan were similar to the first set and contained similar attorney fee provisions. Doc. 67-1 at 62, 69, 78, 85, 94, 101, 105.

Finally, on January 8, 2016, the Czaplas signed a cross-collateralization agreement under which collateral for either loan would serve as collateral for both. Doc. 67-1 at 108–

114. Susan Czapla signed this agreement as president and secretary of Quality Home, and the Czaplas signed as individual guarantors of the loan. *Id*. at 114.

Quality Home eventually defaulted on its loans to Valley National by failing to pay the amounts due. Doc. 67-1 at 5. Under the signed guaranties, the Czaplas were obligated to pay the amounts due from Quality Home but failed to do so, placing them in default as well. *Id*. at 6. As a result, on September 16, 2019, Valley National sent Quality Home and the Czaplas a demand letter notifying them of the default, accelerating the amounts due, and demanding full payment within ten days. Doc. 67-1 at 119–122. As of the date of the letter, the amount due under the first loan was $359,825.23 plus late charges, and the amount due under the second loan was $45,475.46. *Id*. at 120.

When Defendants still failed to pay the amounts owed, Valley National noticed a foreclosure of the real property described in the mortgages at issue.  In anticipation of the foreclosure, Valley National ordered an appraisal of the property.  The appraisal, dated December 3, 2019, valued the property at $360,000 "as is" on November 26, 2019.[3] Doc. 67-1 at 202, 124–252.

One day before the foreclosure, Quality Home filed a Chapter 7 bankruptcy petition, which stayed the foreclosure until September 8, 2020, when the bankruptcy court granted Valley National relief from the automatic stay so it could proceed with foreclosure. Doc. 67-1 at 6–7. Valley National then noticed the foreclosure for October 23 and conducted the

---

[3] The real property described in the mortgages is located at 6251 U.S. Highway 231, Wetumpka, Alabama, which is the business address listed for Quality Home on the loan documents. *See, e.g,* Doc. 67-1 at 10, 14, 22, 33, and 43.

foreclosure on that date during the legal hours of sale. *Id*. at ¶¶ 20–21. The bank submitted the highest and best bid at the foreclosure sale with a credit bid of $292,100. Thus, the property was sold to Valley National, and its bid was credited against the outstanding loan amounts. *Id*. at ¶¶ 21, 22. Valley National sold the property fifteen months later for $289,500. *Id*. at ¶ 23.

In November 2020, shortly after the foreclosure, Valley National filed a Complaint against the Czaplas for breach of contract under the guaranties. Doc. 1 at 2. In October 2021, Valley National filed an Amended Complaint adding Quality Home as a Defendant. Doc. 40. The Amended Complaint contains four claims: breach of contract against the Czaplas as guarantors and breach of contract, unjust enrichment, and money had and received against Quality Home. Valley National demanded judgment for the outstanding indebtedness under the loans, plus accrued and accruing interest and expenses of collection, including attorneys' fees and costs. Doc. 40 at 10.

Quality Home was served with a copy of the Summons and Complaint on December 27, 2021. Doc. 45. Under Rule 12 of the Federal Rules of Civil Procedure, it had 21 days to file an answer or responsive pleading. It failed to do so. On February 22, 2022, Valley National filed an application for entry of default by the Clerk, which was entered on February 24. Docs. 49, 50. On April 25, Plaintiff filed its Motion for Default Judgment. Doc. 61. Despite the filing of this motion, Quality Home still has not answered or otherwise responded to Valley National's Amended Complaint.

As of August 2, 2022, the total amount of debt outstanding under the loans, exclusive of attorneys' fees and costs, was $254,511.54, which includes $181,523.91 in

principal, $887.25 in late fees, $3,310 in appraisal fees, and $1,050 for an environmental review, along with $67,740.38 in interest,[4] which continues to accrue. Additionally, as of the filing of its summary judgment motion, Valley National had incurred $74,943.48 in attorneys' fees and costs through June 30, 2022, and had paid a total of $71,543.34 of those fees. Doc. 67-2 at 3.

## III.   THE CZAPLAS' RESPONSE TO SUMMARY JUDGMENT

After Valley National filed its Motion for Summary Judgment, the Czaplas filed two Motions to Dismiss (Docs. 69 and 70) and a response (Doc. 75) to Valley National's summary judgment motion.

In the first Motion to Dismiss, the Czaplas claim that, even without verification of a forensic expert, it is clear that Susan Czapla's signature on a 2010 promissory note and business loan agreement are forged. Doc. 69 at 1. Even if Susan Czapla is correct about her signature, those two documents predate the loan documents at issue in this lawsuit. In her deposition, she admitted signing a promissory note to the bank dated May 28, 2008. *See* S. Czapla Dep. at 19:2–20:2 and Ex. 3. That loan was periodically renewed, and the two allegedly forged documents are from a 2010 renewal. The final renewal—the first loan described above—occurred on December 15, 2015, and Susan Czapla admits signing the note, loan agreement, mortgage, assignment of rents, security agreement, and loan guaranty for that renewal. *Id*. at 23:19–31:9.

---

[4] Valley National did not submit a copy of the environmental review, and the supporting declaration provides no explanation as to why an environmental review was required. The declaration also does not include a detailed interest calculation showing the rate of interest or the dates included in the calculation.

In the second motion, the Czaplas state the only undisputed fact is that they did not knowingly and personally guarantee Quality Home's commercial loans. Doc. 70 at 1. They then claim that Valley National misled them about the nature of the guaranties, forged their signatures, was negligent in incorrectly listing one of the Defendants as an officer of the corporation, and was unprofessional during closings. *Id*. Finally, they claim Valley National's attorney tried to intimidate them during the parties' settlement conference *Id*. at 1–2.

In their summary judgment response, they reiterate the above statements and arguments but further assert that the foreclosure sale cannot be upheld because the price was so inadequate as to shock the conscience. *See* Doc. 75 at 1–4. In support of their response, they attach printouts from two websites dated October 2022 showing the listing price of various commercial properties in Wetumpka (Doc. 75-1); copies of certain Valley National court filings[5] (Doc. 75-2); a 2008 appraisal of the real property showing that it appraised for $520,000 as-is and $740,000 after a proposed expansion (Doc. 75-3); copies of Susan Czapla's deposition transcript, where she testified that the signatures on the 2010 business loan agreement and promissory note are not hers (Doc. 75-4); copies of Piotr

---

[5] The Czaplas claim that Doc. 75-2 contains "contradicting statements" by Valley National. Doc. 75-2 at 1. The first page is a page from Valley National's Notice Concerning Settlement Conference and Mediation, with the phrase "engaged in good faith settlement negotiations" underlined. Doc. 75-2 at 1. The second page is taken from Valley National's response to the Czaplas' Motion to Dismiss, and the Czaplas have highlighted the portion where Valley National states that Defendants have no willingness to pay any amounts due and that Valley National will not negotiate against itself by offering to accept anything less than a full judgment when Guarantors are not willing to concede anything. *Id*. at 2. The third page is another excerpt from the same response, and the Czaplas have highlighted the portion wherein Valley National disputes that any signatures "were forged, but, in any event, such self—serving statements are a red herring." *Id*. at 3. Having reviewed these documents, the Court finds that they have no evidentiary value and are immaterial to the issues before the Court—whether QHHC and the Czaplas are in default under the loan documents and, if so, the damages to which Valley National is entitled.

Czapla's deposition where he said he was never an officer of Quality Home, that the signatures on certain documents were "possibly" his and "appear to be" his, and that he did not have an opportunity to read documents before signing them (Doc. 75-4); copies of the documents allegedly reflecting Susan Czapla's real signature and the forged signatures on the 2010 renewal documents (Doc. 75-6); and a copy of Valley National's summary judgment brief, with certain provisions regarding the adequacy of the foreclosure underlined (Doc. 75-7).

Having reviewed the Czapla's evidentiary submissions, the Court finds that the Czapla's have failed to bring forth any evidence disputing the facts set forth in the preceding section or otherwise supporting their claim that the only undisputed fact is that they did not knowingly and personally guarantee Quality Home's loans. The overwhelming evidence shows that Susan Czapla signed the relevant loan documents on behalf of Quality Home, that the Czapla's signed the individual guaranties, and that both Quality Home and the Czaplas defaulted on their obligations under the documents.

## IV.    MOTION FOR DEFAULT JUDGMENT

### A.    Legal Standard

The Federal Rules of Civil Procedure provide that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Once a party has defaulted, all well-pleaded factual allegations of the complaint are deemed admitted. *Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1106 (11th Cir. 2015). Entry of default judgment is then "warranted when there is 'a

sufficient basis in the pleadings for the judgment entered.'" *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) (quoting *Nishimatsu Const. Co. v. Houston Nat. Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). The "sufficient basis" standard is "akin to that necessary to survive a motion to dismiss for failure to state a claim." *Id.* "When evaluating a motion to dismiss, a court looks to see whether the complaint contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

### B.    Discussion

To date, over a year after the Amended Complaint was served on Quality Home, it has failed to plead or otherwise defend against Valley National's action. Fed. R. Civ. P. 55(a). Thus, Quality Home is in default, and all well-pleaded factual allegations of the Amended Complaint are deemed admitted.

In its Motion for Default Judgment, Valley National asserts that it is entitled to a default judgement on its breach of contact claim.[6] Under Alabama law, a plaintiff must demonstrate the following elements for breach of contract: (1) a valid contract binding the

---

[6] Valley National makes no mention of the two other claims in the Amended Complaint: unjust enrichment and money had and received. Therefore, the Court treats those claims as abandoned and will not address them. *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *Bowman v. City of Birmingham*, No. 2:17-CV-255-AKK, 2018 WL 11216895, at *1 (N.D. Ala. May 29, 2018) (The law is well settled in this circuit that a legal claim or argument that has not been briefed is deemed abandoned and that mentioning an issue without providing specific argument in support is not sufficient, even when a plaintiff proceeds pro se."). As a practical matter, abandonment of these two claims has no bearing on the amount of damages Valley National is entitled to recover from Defendants.

parties, (2) the plaintiff's performance under that contract, (3) the defendant's nonperformance, and (4) damages.[7] *Starr Aviation Agency, Inc. v. AUA, Inc.*, No. 2:12-CV-02039-HGD, 2012 WL 6864407, at *4 (N.D. Ala. Dec. 6, 2012), *report and recommendation adopted,* No. 2:12-CV-02039-WMA, 2013 WL 169291 (N.D. Ala. Jan. 16, 2013) (quoting *Baldwin v. Panetta*, 4 So. 3d 555, 561 (Ala. Civ. App. 2008) (in turn quoting *S. Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995))).

In its motion, Valley National contends, as a result of Quality Home's default, that the admitted facts from the Amended Complaint demonstrate (1) Quality Home executed the loan documents promising to pay the indebtedness owed and to perform all of its obligations under the loan documents; (2) the bank complied with its contractual obligations by extending the loans to Quality Home; (3) Quality Home defaulted under the loan documents by failing or refusing to pay the amounts owed despite written demand from the bank; and (4) Quality Home is liable for attorneys' fees and costs incurred in collecting the amounts owed. The Court agrees.[8] Therefore, because the Amended Complaint contains sufficient factual matter, accepted as true, to state a claim for breach of contract, the Court finds that it provides a sufficient basis for the default judgment on that claim. Accordingly, entry of a default judgment against Quality Home is warranted.

---

[7] The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000. Doc. 1 at 1. It is well settled that a federal court exercising diversity jurisdiction applies state substantive law and federal procedural law. *Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1357 (11th Cir. 2014) (citing *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)).

[8] Although the Czaplas' do not represent QHHC and, thus, could not argue on its behalf, the Court notes that nothing in their filings brings any of these facts into dispute.

## V.   MOTION FOR SUMMARY JUDGMENT AGAINST CZAPLAS

### A.   Summary Judgement Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. . . . [A dispute] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and alerting the court to portions of the record that support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, once the movant has satisfied this burden, the nonmovant is similarly required to cite portions of the record showing the existence of a material factual dispute. *Id.* at 324. To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether a genuine dispute for trial exists, the court must view all the evidence in the light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmoving party's favor. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see* Fed. R. Civ. P. 56(a).

### B.    Discussion

To prevail on summary judgment under Alabama law, "[e]very suit on a guaranty agreement requires proof of the existence of the guaranty contract, default on the underlying contract by the debtor, and nonpayment of the amount due from the guarantor under the terms of the guaranty." *Sharer v. Bend Millwork Sys., Inc.*, 600 So. 2d 223, 225–26 (Ala. 1992) (quoting *Delro Indus., Inc. v. Evans*, 514 So. 2d 976, 979 (Ala. 1987)); *see also PNC Bank v. Classic Crab, Inc.*, No. CV 15-00459-KD-C, 2016 WL 4257360, at *3 (S.D. Ala. Aug. 11, 2016). A guarantor is "'bound only to the extent and in the manner stated in the contract of guaranty.'" *Fed. Nat. Mortg. Ass'n. v. RLG Properties Venture Corp*, No. 5:14-CV-01333-AKK, 2015 WL 1734391, at *2 (N.D. Ala. Apr. 15, 2015) (quoting *Pate v. Merchants Nat. Bank of Mobile*, 428 So. 2d 37 (Ala. 1983)). Additionally, if the guaranty is a continuing guaranty, an "additional element, notice to the guarantor of the debtor's default, must be proved."[9] *PNC Bank*, 2016 WL 4257360, at *3 (citing *Delro*, 514 So. 2d at 979).

Although the Czaplas assert that two loan documents from a 2010 renewal of the original 2008 loan were forged, they do not deny signing the original 2008 promissory note, the 2015 renewal documents, the 2017 loan documents, or the guaranty contracts covering both loans. They also do not dispute that Quality Home defaulted on the underlying loan to Valley National, that they failed to make payments under the terms of their guaranties, or that Valley National provided notice to them through the September

---

[9] Each guaranty states that it is a "continuing guaranty." Doc. 67-1 at 52, 56, 99, and 103.

2019 letter. Thus, Valley National has established all elements of its breach of guaranty claim through uncontroverted evidence of the existence of the agreements signed by the Czaplas, default on the underlying note by Quality Home, nonpayment under the guaranties by the Czpalas, and notice of the default.

Accordingly, the Czaplas bear the burden of citing to portions of the record showing the existence of a material factual dispute with respect to these elements. They raise several arguments in opposition to summary judgment, but none has merit. First, with respect to their forgery claim, as mentioned above, there is no dispute that the Czaplas signed each of the documents at issue in this lawsuit. Any alleged forgery of two of the 2010 renewal documents would have no bearing on whether Quality Home defaulted on the 2015 and 2017 loan documents or whether the Czaplas subsequently defaulted on their guaranties. In short, even crediting the Czaplas' forgery claims as true, they have failed to come forward with evidence establishing a question of fact as their signatures on the documents made the basis of Valley National's breach of contract claim.

Next, they assert a defense based on alleged conduct by Valley National and its attorney. Susan Czapla testified that the bank was "unprofessional" because there was "an instance or two" when someone from the bank went by her office because he had forgotten something. Doc. 67-5 at 12 (S. Dep. at 38:12–15). They also state that Valley National's attorney intimidated them by "threatening" that they "needed to be careful about bringing up the 'signatures' and because [the] statements were taken under oath and 'we just had different recollection.'" Doc. 70 at 2. However, they offer no legal authority establishing this type of conduct as a defense to a breach of contract claim. It simply has no bearing on

whether they defaulted under the guaranties. *See Regions Bank v. Legal Outsource PA*, 2017 WL 443371, at *2 (M.D. Fla. Feb. 1, 2017), *amended in part,* 2017 WL 11461035 (M.D. Fla. Mar. 27, 2017), *aff'd,* 936 F.3d 1184 (11th Cir. 2019) (in case where defendants did not dispute default but claimed bank had ulterior motive in pursuing default, finding the defense irrelevant to establishing elements of claims of breach). Likewise, the Czaplas fail to show how any alleged negligence by the bank in incorrectly listing Piotr Czapla as Quality Home's secretary, particularly when he admits to signing on the line identifying him as the secretary, precludes summary judgment. Based on the Court's review of the record, the only documents listing Piotr Czapla as secretary of Quality Home are the 2008 real estate mortgage and assignment of leases and rents and the two 2010 renewal documents that they claim are forged. Again, the 2010 renewal documents are not at issue in this lawsuit, and, even if Piotr Czapla was not the secretary of Quality Home in 2008, the Czaplas do not dispute that Susan Czapla, as president of Quality Home, had authority to act on its behalf and that she signed all the documents in question.

The Czaplas next argue that they did not knowingly sign the guaranties. Piotr Czapla testified, "there's a possibility that [he] signed those without knowing what it was and not being presented in a way that – that [he] would have agreed to sign them." Doc. 67-5 at 7 (P. Czapla Dep. at. 21:15–18). He also alleges he did not understand what the documents meant when he signed them. *Id*. at 11 (P. Czapla at 37:9–13). However, this argument is "undermined by the black-letter principle that '[a] person who executes a written document in ignorance of its contents cannot plead ignorance in order to avoid the effect of the document.'" *Wachovia Bank v. Longcrier Homes, Inc.*, No. 09-CV-0703-WS-C, 2010 WL

320484, at *3 (S.D. Ala. Jan. 21, 2010) (quoting *Quality Foods, Inc. v. U.S. Fire Ins. Co.*, 715 F.2d 539, 542 (11th Cir. 1983)); *see also Upton v. Tribilcock*, 91 U.S. 45, 50 (1875) ("It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained."); *Gov't St. Lumber Co. v. AmSouth Bank, N.A.*, 553 So. 2d 68, 75 (Ala. 1989) ("A guarantor cannot defeat the plain terms of the agreement by stating that he did not intend to obligate himself to the provisions of the guaranty agreement.") (citations omitted). Accordingly, even if the Court accepts the Czaplas' claim as true—that they did not know what they were signing and did not intend to personally guarantee their corporation's loans—this argument fails.

Finally, the Czaplas argue that the bank's credit bid at foreclosure was insufficient. Under Alabama law, a foreclosure sale will not be set aside on inadequate price alone unless the price realized "is so inadequate as to shock the conscience." *Synovus Bank v. Summerford*, No. 2:12-CV-3598-VEH, 2014 WL 6607944, at *6 (N.D. Ala. Nov. 20, 2014) (quoting *Hayden v. Smith*, 216 Ala. 428, 430–31 (1927)). The general rule is that a price that shocks the conscience may "raise a presumption of fraud, trickery, unfairness, or culpable mismanagement, and therefore be sufficient ground for setting the sale aside." *Berry v. Deutsche Bank Nat. Tr. Co.*, 57 So. 3d 142, 148 (Ala. Civ. App. 2010) (citations and quotations omitted). Here, the bank's bidding price was 81% of the appraised value. State and federal courts in Alabama have upheld foreclosure bids for this percentage or less. *See Mt. Carmel Ests., Inc. v. Regions Bank*, 853 So. 2d 160 (Ala. 2002) (81% of fair market value); *Vision Bank v. Lanza*, No. CIV.A. 10-00628-KD-M, 2011 WL 5190847, at

*4 (S.D. Ala. Nov. 1, 2011) (72% of fair market value); *Breen v. Baldwin Cnty. Fed. Sav. Bank*, 567 So. 2d 1329, 1332–1333 (Ala. 1990) (54% of alleged fair market value); *Walker v. N. Am. Sav. Bank*, 142 So. 3d 590, 598–99 (Ala. Civ. App. 2013) (91.5% of market value based on tax assessor's records); *Perry v. Fed. Nat. Mortg. Ass'n*, 100 So. 3d 1090, 1102 (Ala. Civ. App. 2012) (% of market value based on tax assessor's records). "Significantly, [the Eleventh Circuit] affirmed [a] trial court's ruling that a foreclosure sale price equal to 20%, 30%, or 66% of a property's fair market value (depending on the appraisal used) was not so inadequate as to shock the judicial conscience." *Synovus Bank* at *7 (citing *CS Assets, LLC v. W. Beach, LLC*, 370 F. App'x 45, 46 (11th Cir. 2010) (stating that the "choice of percentage is not as determinative in the end as the observation that no misconduct tainted the auction). Here, based on the above case law, the Court finds that the bank's bid of 81% of the appraised value of the property was not so low as to shock the conscience.

The Czaplas take issue with the appraised value as stated in the appraisal ordered by the Bank before foreclosure and submit, instead, a 2008 appraisal of the property for $540,000 as-is and $740,000 with a proposed expansion.[10] Even assuming that a twelve-year old appraisal reflected a more accurate value of the property than one prepared ten

---

[10] The Czaplas also rely on printouts from web sites showing the listing prices of two commercial properties that were for sale in October 2022. Even assuming these listing values are admissible in evidence, there is no competent testimony before the Court regarding (1) comparability of the market in October 2022 and the market when Valley National ordered an appraisal or when the property was sold or (2) how their former property compares with the properties on their printout as far as size, age, accessibility, condition, amenities, renovations, necessary repairs, or other characteristics. Moreover, a *listing* price is frequently not an accurate reflection of the value of real property; it is merely the *highest* amount a seller hopes to get. Therefore, the web site printouts submitted by the Czaplas do not create a genuine issue of material fact regarding the adequacy of the bank's bid at foreclosure.

months before the foreclosure, the bank's bid of $292,000 is 39% of the *higher* amount[11] in the 2008 appraisal—a percentage approved by the Eleventh Circuit as not so inadequate as to shock the judicial conscience. The bid was not so low as to suggest fraud, trickery, unfairness, or culpable mismanagement, and there is no evidence that misconduct somehow tainted the auction. In the absence of any issue of impropriety with the foreclosure, the Court finds no reason to find the bank's credit bid insufficient.

In summary, the undersigned finds that the undisputed facts show that the Czaplas executed the valid guaranties at issue in this lawsuit, that Valley National performed its obligations under the guaranties, that the Czaplas failed to perform by failing to make payments as required, and that Valley National has suffered damages. Accordingly, Valley National is entitled to summary judgment on this claim.

## VI.    THE CZAPLAS' MOTIONS TO DISMISS

As mentioned above, after Valley National filed its summary judgment motion, the Czaplas filed two motions to dismiss asserting their forgery argument, that Valley National misled them and they did not understand the meaning of the guaranties, that Valley National was negligent in listing Piotr Czapla as the secretary of Quality Home, and Valley National was unprofessional during closings. Because the Court has already addressed these arguments, further discussion is not warranted.

---

[11] The Czaplas have cited no evidence establishing that the proposed expansion, the basis of the $740,000 appraised value, was ever completed.

## VII.   ATTORNEYS' FEES

In addition to the outstanding debt under the loan, fees, and outstanding interest, Valley National seeks payment of attorneys' fees and costs incurred in connection with its collection proceedings. Alabama law provides that attorney fee provisions are enforceable. *Jones v. Regions Bank*, 25 So. 3d 427, 441 (Ala. 2009) (citations omitted). However, "[u]nder Alabama law, attorney's fees are recoverable . . . subject to Alabama's imposition of a reasonableness constraint on all fee shifting contracts, as a matter of public policy." *PNC Bank v. Classic Crab, Inc.*, No. CV 15-00459-KD-C, 2016 WL 4257360, at \*4 (S.D. Ala. Aug. 11, 2016) (citing *Willow Lake Residential Ass'n, Inc. v. Juliano*, 80 So. 3d 226, 241 (Ala. Civ. App. 2010) (recognizing that "Alabama law reads into every agreement allowing for the recovery of attorney's fees a reasonableness limitation")). Accordingly, Valley National is entitled to recover its reasonable attorneys' fees and costs incurred in collecting the debt.

The Supreme Court has established that the "lodestar" approach is the appropriate method of determining a reasonable attorney's fee for the prevailing party. *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433–34 (1983)). Under this approach, the starting point requires the court to determine the "lodestar" figure, which equals the reasonable hourly rate multiplied by the hours reasonably expended. This yields a presumptively reasonable fee. *Id*.; *see also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986).

18

The reasonableness of the hourly rate is governed by "the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman*, 836 F.2d at 1299 (citation omitted). The burden to establish this prevailing rate rests with the movant. "[A] movant may meet [her] burden by producing either direct evidence of rates charged under similar circumstances or opinion evidence of reasonable rates." *Duckwork v. Whisenant*, 97 F.3d 1393, 1396 (11th Cir. 1996) (citing *Norman*, 836 F.2d at 1299). And, a district court may make an independent judgment based on its own experience and knowledge concerning the rates charged by lawyers of similar skill in similar lawsuits in the same market area. *See Norman*, 836 F.2d at 1303. Further, in assessing the reasonable hourly rate, courts consider the following factors: (1) time and labor required; (2) novelty and difficulty of the questions; (3) skill requisite to perform the legal services properly; (4) preclusion of other employment by the attorney due to acceptance of the case; (5) customary fee for similar work in the community; (6) existence of a contingent-fee contract; (7) time limitations imposed by the client or the circumstances; (8) amount of damages and type of relief involved and the results obtained; (9) experience, reputation, and ability of the attorneys; (10) undesirability of the case; (11) nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* at 1299–1300 ("In evaluating comparability of the market rates being attested to, [courts] may wish to consider any of the *Johnson* factors to the extent that they suggest that comparables offered may not be relevant to the issues before the court or as they may affect the weight to be given to the comparables being offered the court.") (citing *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714,

717–19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989)). After the court has established a range in the prevailing market rate, it should estimate the reasonable hourly rate based on an assessment of the skill demonstrated by the attorneys in the case. *See Norman*, 836 F.2d at 1300.

Next, the court must ascertain whether the hours expended are reasonable and, therefore, compensable. The fee applicant is expected to exercise "billing judgment" by excluding from the fee application "'excessive, redundant or otherwise unnecessary' hours," which are hours "that would be unreasonable to bill to a client and therefore to one's adversary irrespective of the skill, reputation or experience of counsel." *Id*. at 1301–02 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434, 437 (1983)). If this has not been done, then the court must do it for the applicant by "cut[ting] the amount of hours for which payment is sought, pruning out those that are 'excessive, redundant, or otherwise unnecessary.'" *Am. Civil Liberties Union v. Barnes*, 168 F.3d 423, 428 (11th Cir. 1999). When the court "has determined the number of hours reasonably expended on the case and a reasonable hourly rate for compensation, those two figures are multiplied to produce the 'lodestar' calculation." *Davis v. Locke*, 936 F.2d 1208, 1215 (11th Cir. 1991). "This lodestar 'provides an objective basis on which to make an initial estimate of the value of a lawyer's services.'" *Cullens v. Georgia Dep't of Transp.*, 29 F.3d 1489, 1492 (11th Cir. 1994) (quoting *Hensley*, 461 U.S. at 433).

Valley National has established through the declaration of Hannah Lahr, one of its attorneys, that, as a result of its collection proceedings, it had incurred $74,943.48 in attorneys' fees and costs through June 30, 2022, and had paid $71,543.34 of those fees at

the time it filed its summary judgment motion. Lahr's declaration submitted in support of Valley National's Motion for Default Judgment includes redacted itemized bills through April 30, 2022. Doc. 65. The declaration filed in support of the Motion for Summary Judgment includes redacted itemized bills through June 20, 2022. Although the itemized bills identify the hourly rates of the legal professionals who billed time to this matter, Lahr's declarations and attachments fail to identify the billing professionals as a partner, associate, paralegal, or otherwise; describe the experience of each billing professional; or state the total number of hours billed by each professional. Thus, while the undersigned has concluded that Valley National is entitled to reasonable attorneys' fees, the Court cannot assess the reasonableness of the claimed fees or calculate the fees to be awarded without additional information from Valley National.

## VIII.  CONCLUSION

Accordingly, the Magistrate Judge **RECOMMENDS** as follows:

1.      Valley National's Motion for Default Judgment (Doc. 61) as to Quality Home be GRANTED;

2.      Valley National's Motion for Summary Judgment (Doc. 67) as to the Czaplas be GRANTED;

3.      The Motions to Dismiss filed by the Czaplas (Docs. 69, 70) be DENIED;

4.      Damages be awarded jointly and severally against Quality Home and the Czaplas in the amount of $254,511.54, which includes $181,523.91 in principal, $887.25 in late fees, and $4,360 in expenses, plus pre-judgment interest to be calculated after submission of an appropriate interest calculation by Valley National;

5.      Valley National be awarded reasonable attorneys' fees, to be calculated after submission of evidentiary materials, including itemized billing from June 30, 2022, through present, that identify the role of each billing professional, the amount of experience of each billing professional, and the total number of hours billed by each professional; and

6.      This matter be referred back to the undersigned Magistrate Judge for a recommendation on interest and attorneys' fees.

Further, it is **ORDERED** as follows:

1.      Valley National must submit updated, detailed interest calculations and the information identified above regarding attorneys' fees by **January 31, 2023.**

2.      On or before **January 31, 2023**, the parties may file objections to this Recommendation. The parties must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made. Frivolous, conclusive, or general objections will not be considered by the Court. The parties are advised that this Recommendation is not a final order and, therefore, is not appealable.

Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with 28 U.S.C. § 636(b)(1) will bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waive the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except on grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH CIR. R. 3-1. *See Stein v. Reynolds Sec.,*

*Inc.*, 667 F.2d 33 (11th Cir. 1982*); see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

Done this 17th day of January, 2023.

/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE